United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM M. HAWKINS III,

               Plaintiff,

   v.

KPMG LLP, a limited liability partnership, HARVEY ARMSTRONG, an individual, QUELLOS GROUP LLC, a Delaware limited liability company, and DOES 1 through 20, inclusive,

               Defendants.

No. C 05-04763 MHP

**MEMORANDUM & ORDER**
**Re: Motion to Remand;**
**Motion to Compel Arbitration**

     Plaintiff William M. Hawkins III filed this action in California state court on July 15, 2005, alleging generally that defendants KPMG LLP, Harvey Armstrong and Quellos Group LLC fraudulently induced plaintiff to purchase a tax shelter which defendants knew to be illegal. Defendants removed the action to federal court on November 21, 2005 under 9 U.S.C. section 205, which provides federal subject matter jurisdiction over lawsuits involving international arbitrations. Now before the court are plaintiff's motion to remand the action to state court and defendants' motion to compel arbitration and stay the federal proceedings. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

1

**United States District Court**
For the Northern District of California

BACKGROUND[1]

Plaintiff is a Silicon Valley entrepreneur and the founder of two video game companies, Electronic Arts and 3DO. In 1996 plaintiff sold a quantity of stock, resulting in substantial capital gains. He turned to defendant KPMG LLP for help in minimizing the taxes he would have to pay on those gains. As set forth in a series of engagement and opinion letters, KPMG provided plaintiff with two investment vehicles, both of which were ostensibly intended to reduce his tax liability. See Declaration of Harvey Armstrong in Support of Defendant KPMG LLP's Motion to Compel Arbitration and Stay Proceedings ("Armstrong Dec."), Exh. A. The investment vehicle at issue in the instant motions is called a "FLIP," or Foreign Leveraged Investment Program.

The FLIP was intended to operate, generally, as follows. Plaintiff paid $1.8 million to acquire a warrant—similar to an option—to purchase a majority stake in a Cayman Islands corporation called Harbourtowne Offshore, Inc. ("Harbourtowne"). Declaration of Stephanie L. Thomases in Support of Defendant KPMG LLP's Motion to Compel Arbitration and Stay Proceedings ("Thomases Dec."), Exh. A (the "Warrant"). None of the defendants in this lawsuit is a signatory to the Warrant. Both plaintiff and Harbourtowne then purchased Union Bank of Switzerland ("UBS") stock, as well as UBS stock options. When plaintiff subsequently sold his UBS stock, he used his ownership interest in Harbourtowne, established through the Warrant, as a justification for adding Harbourtowne's basis in its UBS stock to his own. The sale therefore resulted, at least in theory, in a large capital loss for plaintiff.

The IRS disagreed, giving rise to this lawsuit. Following an audit of plaintiff's tax returns between 1998 and 2001, the IRS required plaintiff to pay additional taxes, as well as penalties and interest. The penalties and interest alone allegedly exceed $13 million.

Meanwhile, the Department of Justice and the United States Senate launched an investigation into KPMG's sale of tax shelters such as the FLIP. On August 26, 2005 KPMG entered into a "Deferred Prosecution Agreement" with the DOJ. Under the terms of the DOJ agreement, KPMG agreed to pay $456 million in fines, restrict its tax practices, and stipulate to a series of factual admissions related to its sale of tax shelters.

United States District Court
For the Northern District of California

1    Plaintiff filed this lawsuit against defendants in San Mateo County Superior Court on July

2    15, 2005, alleging state law fraud claims.  Defendants removed to this court on November 21, 2005.

3    The sole basis for federal jurisdiction is 9 U.S.C. section 205, which provides as follows:

4        Where the subject matter of an action or proceeding pending in a State court relates to
         an arbitration agreement or award falling under the Convention, the defendant or the
5        defendants may, at any time before the trial thereof, remove such action or
         proceeding to the district court of the United States for the district and division
6        embracing the place where the action or proceeding is pending. The procedure for
         removal of causes otherwise provided by law shall apply, except that the ground for
7        removal provided in this section need not appear on the face of the complaint but may
         be shown in the petition for removal. For the purposes of Chapter 1 of this title any
8        action or proceeding removed under this section shall be deemed to have been
         brought in the district court to which it is removed.

9    The "Convention" covers, *inter alia*, agreements involving foreign corporations such as

10   Harbourtowne.  The Warrant between plaintiff and Harbourtowne contains an arbitration clause

11   which states as follows:

12       Any dispute, controversy or claim arising out of or relating to this Agreement shall be
         settled in San Francisco, California in accordance with the rules of the American
13       Arbitration Association and judgment upon the award rendered by the arbitrator may
         be entered in any court having jurisdiction thereof.
14

15   Warrant at 4.

16       Defendants argue that this lawsuit was properly removed to federal court because plaintiff's

17   fraud claims "relate[] to" the arbitration clause in the Warrant.  Defendants further argue that this

18   court should compel arbitration of the FLIP-related claims, and that litigation of plaintiff's other

19   claims should be stayed until the arbitration is complete.  Plaintiff contends that the arbitration

20   clause does not support federal jurisdiction, that the FLIP-related claims are beyond the scope of the

21   arbitration clause, and that litigation on plaintiff's other claims should proceed regardless of whether

22   arbitration is compelled for the FLIP-related claims.  Plaintiff also seeks fees and costs associated

23   with defendants' allegedly improper removal to this court.

24

25

26

27

28
                                                    3

DISCUSSION

Before considering defendants' motion to compel arbitration, the court must consider whether removal under section 205 was proper.  If removal was improper, this court lacks subject matter jurisdiction to adjudicate defendants' motion.

I.      Subject Matter Jurisdiction

Plaintiff argues that the arbitration clause in the Warrant is insufficient to establish subject matter jurisdiction for a number of reasons.  First, plaintiff contends that the copy of the Warrant offered by defendants has not been properly authenticated, and thus may not be used either as the basis for establishing jurisdiction or to compel arbitration.  Second, plaintiff argues that KPMG's stipulations in connection with the DOJ settlement establish that the Warrant is a "sham," and that the arbitration clause contained therein has no legal force.  Third, plaintiff argues that this lawsuit is not "relate[d]" to the arbitration clause in the Warrant because the Warrant is not integral to plaintiff's fraud claims and because defendants, which are not parties to the Warrant, have no right to invoke the arbitration clause against plaintiff.  On these bases, plaintiff argues that this action should be remanded to state court and that the motion to compel arbitration should be denied.  The court considers each argument in turn.

A.      Authentication of the Warrant

Plaintiff argues that defendants may not rely on the Warrant in establishing jurisdiction or seeking to compel arbitration because the Warrant is not properly authenticated.  Defendants need not submit an authenticated copy of the document for purposes of establishing jurisdiction, which, as discussed below, should be evaluated based on the face of the pleadings and petition for removal.  See Bautista v. Star Cruises, 396 F.3d 1289, 1301 (11th Cir.), cert. dismissed, --- U.S. ---, 125 S. Ct. 2954 (2005) ("Section 205 does not require a district court to review the putative arbitration agreement—or investigate the validity of the signatures thereon—before assuming jurisdiction").

4

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  As the court resolves the instant motions without reaching the ultimate merits of defendants' motion

2  to compel arbitration, it need not reach the question of whether the Warrant is admissible.[2]

3

4    B.    Validity of the Warrant

5    Plaintiff next argues that the arbitration clause is unenforceable because defendants have

6  stipulated that the Warrant is a "sham."  In support of this argument, plaintiff cites a portion of

7  KPMG's Statement of Facts in connection with the DOJ agreement, which states that "[t]he FLIP

8  and OPIS opinions signed by KPMG tax partners . . . falsely stated that . . . (c) certain money was

9  paid as part of an investment (i.e., for a warrant or a swap), when in truth and in fact the money

10  constituted fees due to promoters and other facilitators of the transaction."  Request for Judicial

11  Notice in Support of Plaintiff William M. Hawkins III's Motion to Remand Action to State Court

12  ("Hawkins RJN"), Exh. 4-C ¶ 9.  Plaintiff contends that KPMG's misrepresentation as to the use of

13  the money paid to obtain the Warrant renders the terms of the Warrant unenforceable against

14  plaintiff.

15    As an initial matter, plaintiff's argument that the government—a third party to the

16  Warrant—was defrauded is not dispositive of the question of whether the arbitration clause is

17  enforceable between the Warrant's signatories.  Plaintiff does not allege that *he* was deceived as to

18  the purpose of the Warrant; the complaint makes clear that plaintiff knew that the Warrant was part

19  of an overall scheme to avoid tax liability.  Also, as defendants correctly point out, the fact that the

20  Warrant as a whole was fraudulent does not preclude enforcement of the arbitration clause.  See

21  Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 402–03 (1967) (holding that

22  arbitration should be compelled unless "the claim is fraud in the inducement of the arbitration clause

23  itself—an issue which goes to the 'making' of the agreement to arbitrate") (citation omitted).

24    Although the Warrant is not *per se* unenforceable as a result of KPMG's fraud, Prima Paint

25  does not end the inquiry in this case.  Unlike in Prima Paint, defendants are not signatories to the

26  Warrant and must rely upon principles of equity for enforcement of the arbitration clause.  The fact

27

28                                                    5

1  that the Warrant was a "sham" bears directly on whether defendants' appeal to equity is well-taken,

2  and is discussed infra.

3       Having resolved plaintiff's challenges to the enforceability of the Warrant as a whole, the

4  court will now consider whether the arbitration clause in the Warrant satisfies the particular

5  jurisdictional requirements of section 205.

6

7       C.     The Requirements of Section 205

8       In order to serve as the basis for jurisdiction under section 205, the arbitration agreement in

9  the Warrant must meet two requirements.  First, it must "fall under the Convention," which requires

10  the agreement to have some connection to foreign entities or international commerce.  See 9 U.S.C.

11  § 202; Certain Underwriters at Lloyd's London v. Argonaut Ins. Co., 264 F. Supp. 2d 926, 932

12  (N.D. Cal. 2003) (Chen, Mag. J.).  Apart from plaintiff's argument that the warrant is a sham, the

13  parties do not dispute that one of the signatories to the Warrant—Harbourtowne—is a foreign

14  company, satisfying the first requirement.  Second, the arbitration agreement must "relate[] to" the

15  subject matter of the lawsuit.  9 U.S.C. § 205.  The parties disagree in several ways about whether

16  the arbitration agreement meets this requirement.

17       As a threshold matter, the parties differ as to the proper extent of this court's review in

18  determining jurisdiction.  Defendants contend that the court should not consider as part of the

19  jurisdictional inquiry whether the claims in this lawsuit are arguably covered by the arbitration

20  agreement, or whether defendants—who are not signatories to the Warrant—have any right to assert

21  the arbitration agreement against plaintiff.  According to defendants, the question of whether the

22  arbitration clause might actually apply to plaintiff's claims goes to the merits of the motion to

23  compel arbitration, and is therefore not a part of the jurisdictional determination.  See Beiser v.

24  Weyler, 284 F.3d 665, 670 (5th Cir. 2002).

25       Plaintiff disagrees with defendants' claim and argues further that under Ninth Circuit law, in

26  order to establish jurisdiction defendants must show more than their right to assert the arbitration

27  clause—they must show that "the parties to the action have entered into an arbitration agreement."

28

6

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

See AtGames Holdings Ltd. v. Radica Games Ltd., 394 F. Supp. 2d 1252, 1255 (C.D. Cal. 2005). The court considers both parties' contentions in turn.

1.    Scope of the Jurisdictional Inquiry

The current leading case considering the nature of the jurisdictional inquiry under section 205 is Beiser, decided by the Fifth Circuit in 2002.  In Beiser, plaintiff brought claims against a group of defendants for wrongfully depriving him of his financial interest in a Hungarian oil field. Beiser, 284 F.3d at 667.  Plaintiff based his claim on two agreements signed by defendants, both of which contained arbitration clauses.  Id. at 666–67.  Plaintiff was not a named party to either agreement, but had signed both in his capacity as director and sole employee of Horizon Energy Limited, a New Jersey limited liability company.  Id. at 666.  Defendants removed to federal court under section 205 on the basis of the two arbitration clauses, and plaintiff moved to remand on the grounds that the dispute was not "related" to the arbitration clauses because plaintiff was not bound by the clauses in his individual capacity.  Id. at 667.

The Fifth Circuit rejected plaintiff's argument.  Noting apparent Congressional intent to allow "quick and easy" removal under section 205, the court set forth a very deferential standard for determining whether an arbitration clause is "relate[d]" to a dispute:  "whenever an arbitration agreement falling under the Convention could *conceivably* affect the outcome of the plaintiff's case, the agreement 'relates to' to [sic] the plaintiff's suit."  Id. at 669, 671 n.7.  Under this deferential standard, the court found that the arbitration clauses related to the subject matter of the lawsuit:

> Here, the two agreements are the only written contracts governing Beiser's work in Hungary.  Beiser was Horizon's only employee; the contracts were entered into specifically to secure his personal expertise and advice in developing the oil interest. Developing Beiser's case will necessarily involve explaining the scope and operation of the two contracts. Even if Beiser is right on the merits that he cannot ultimately be forced into arbitration, his suit at least has a "connection with" the contracts governing the transaction out of which his claims arise.

Id. at 669.  The court noted that "[t]he doctrine of corporate personhood is not an absolute shield to liability for officers, directors, employees and shareholders."  Id.

7

The Fifth Circuit claimed to find further support for its deferential standard in the jurisdictional nature of the inquiry: "Beiser's suggested approach . . . has the disadvantage of frontloading a merits inquiry into the district court's examination of its jurisdiction." Id. at 670. Reasoning by analogy to run-of-the-mill federal question jurisdiction, the court noted that "[t]he language of § 205 strongly suggests that Congress intended that district courts continue to be able to assess their jurisdiction from the pleadings alone." Id. at 672.  According to defendants, this language in Beiser indicates that at the point of asserting jurisdiction the court need not consider whether defendants have a right to enforce the arbitration clause in the Warrant.

The jurisdiction / merits distinction made in Beiser is both misleading and analytically unhelpful in resolving the parties' dispute in this case.  The Fifth Circuit's statement is misleading because federal courts often are required to make factual inquiries in order to evaluate subject matter jurisdiction.  See, e.g., Matheson v. Progressive Specialty Ins. Co., 319 F.3d 1089, 1090 (9th Cir. 2003) (per curiam) (holding that in a diversity suit, the party asserting federal jurisdiction must "prove, by a preponderance of the evidence, that the amount in controversy meets the jurisdictional threshold" using the pleadings and "summary- judgement [sic] -type evidence.").  Similarly, section 205 requires the court to establish two jurisdictional facts.  First, there must be an arbitration agreement "falling under the Convention."  9 U.S.C. § 205.  Second, the arbitration clause must "relate[] to" the subject matter of the lawsuit.  Id.  That the second "fact"—the relationship between the arbitration clause and the lawsuit—overlaps in part with the ultimate question of whether to compel arbitration does not render the jurisdictional inquiry improper.  See Kelton Arms Condominium Owners Ass'n v. Homestead Ins. Co., 346 F.3d 1190, 1192 (9th Cir. 2003) ("[T]he question of jurisdiction is tied to the merits. This is one of those rare cases in which we must decide the merits to decide jurisdiction. We, of course, have jurisdiction to decide jurisdiction.").

The holding in Beiser is fully consistent with this conclusion.  In order to determine whether "an arbitration agreement falling under the Convention could *conceivably* affect the outcome of the plaintiff's case," the court must determine that the clause has some chance of being applied to the claims raised in the lawsuit.  Cf. Beiser, 284 F.3d at 669; id. at 671 (noting that a "frivolous petition

8

United States District Court

For the Northern District of California

for removal" would have to be rejected). Indeed, although it claimed to ignore the merits, the <u>Beiser</u> court clearly considered the substantive question of whether arbitration might ultimately be compelled: "[h]ere, the two agreements are the only written contracts governing Beiser's work in Hungary. Beiser was Horizon's only employee; the contracts were entered into specifically to secure his personal expertise and advice in developing the oil interest." <u>Id.</u> at 669. In light of these facts, and the legal observation that "[t]he doctrine of corporate personhood is not an absolute shield to liability for officers, directors, employees and shareholders," the court concluded that "it is at least conceivable that a court might pierce the corporate veil and hold him personally responsible for the contracts designed to secure his personal involvement on the Hungary development." <u>Id.</u> at 670. Regardless of how the Fifth Circuit chose to characterize this analysis, it is manifestly a preliminary exploration of whether arbitration might ultimately be compelled.

The other cases cited by defendants—which are not binding on this court in any event—either do not support defendants' position, are factually distinguishable from this case, or are so cursory in their reasoning as to have no persuasive force. In <u>Bautista</u>, discussed <u>supra</u>, the Eleventh Circuit considered only whether defendant had to submit a valid, signed copy of the agreement in order to establish jurisdiction. 396 F.3d at 1301. The court stated that it need not "review the putative arbitration agreement" before asserting jurisdiction, but also noted that "NCL's notices of removal met procedural requirements by identifying the relevant documents and describing *how they bind the Plaintiffs to arbitration*." <u>Id.</u> (emphasis added). Here, in contrast, defendants claim that they need not show how plaintiff might be bound.

In cases such as <u>Wilson v. Deutsche Bank AG</u>, No. 05 C 3474, 2005 WL 3299366, at *4 (N.D. Ill. Nov. 30, 2005), <u>Galtney v. KPMG LLP</u>, No. Civ.A. H05583, 2005 WL 1214613, at *3 (S.D. Tex. May 19, 2005), and <u>Sheinberg v. Princess Cruise Lines, Ltd.</u>, 269 F. Supp. 2d 1349, 1353–54 (S.D. Fla. 2003), at least one plaintiff and one defendant were actual parties to the agreements in question, and were indisputably bound. In addition, both the <u>Wilson</u> and <u>Galtney</u> courts conducted preliminary assessments of both jurisdictional prongs which are much more extensive than defendants' proposed rubber stamp.

The only case cited by defendants other than <u>Beiser</u> that is factually on point—where no defendant was a signatory to the agreement containing the arbitration clause—is <u>Reddam v. KPMG LLP</u>, No. CV 04-1227 GLT, slip op. at 3 (C.D. Cal. Dec. 15, 2004), an unpublished case from the Central District of California.  The portion of <u>Reddam</u> dealing with the question of whether the agreement "relates to" the action is a single paragraph which concludes summarily that the agreement containing the arbitration clause "enabled Plaintiffs to implement a number of transactions relevant to this action."  <u>Id.</u>  The opinion does not explain how the transactions are "relevant" or how the clause might affect the outcome of the suit.  <u>Id.</u>  This court is unable to derive any meaningful guidance from <u>Reddam</u>.  In sum, defendants have submitted no persuasive authority suggesting that a court may simply omit any determination of whether defendants have a basis for asserting the arbitration clause.

Having established that a court must consider during the jurisdictional inquiry whether the asserted arbitration clause might apply to the claims at issue in the lawsuit, it remains to be determined what materials the court may consider and the applicable standard of proof.  With respect to the level of proof, defendants argue that any consideration of whether the arbitration clause might be enforceable inevitably leads down a slippery slope to a final determination of whether arbitration should be compelled.  The Fifth Circuit embraced the same false dichotomy, reasoning that "[i]f we were to accept Beiser's view that the agreements 'relate to' his claims only if he turns out on the merits to be personally bound to the agreements, the district court would have had to make a *final conclusion* about whether to pierce Horizon's corporate veil."  <u>Beiser</u>, 284 F.3d at 670 (emphasis added).

The dichotomy is false because a court may explore a jurisdictional fact without reaching a final conclusion as to its truth.  For example, in evaluating jurisdiction in a diversity suit, a court may determine that the amount in controversy more likely than not exceeds $75,000 without reaching a conclusion as to the precise amount of damages.  Congress apparently intended to permit more liberal removal under section 205 than under other statutes conferring removal jurisdiction. <u>See</u> <u>Beiser</u>, 284 F.3d at 674.  The court therefore finds that in order to establish jurisdiction

defendants need only show that there is a reasonable possibility—something more than a "frivolous" or "fanciful" argument—that defendants will be able to assert the arbitration clause to compel arbitration of plaintiff's claims.  Cf. id. at 671 (noting that a "frivolous petition for removal" would have to be rejected); id. at 675 (finding that the "contention that the arbitration clauses under the Convention provide a defense was not fanciful.").

As for the materials a court may consider, other courts construing section 205 have generally determined that a court should only review the pleadings, including the petition for removal, in determining jurisdiction.  Id. at 671; Bautista, 296 F.3d at 1301; 9 U.S.C. § 205 ("The procedure for removal of causes otherwise provided by law shall apply, except that the ground for removal provided in this section need not appear on the face of the complaint but may be shown in the petition for removal.").  In addition, the court may take judicial notice of matters of public record without converting a motion to dismiss or remand into a motion for summary judgment.  See, e.g., Lee v. City of Los Angeles, 250 F.3d 668, 688–89 (9th Cir. 2001).  In sum, the court finds that in order to establish jurisdiction defendants must show, based on the pleadings and petition for removal, as well as judicially noticeable materials, that there is a reasonable possibility that defendants will be able to assert the arbitration clause to compel arbitration of plaintiff's claims in this lawsuit.

2.      Plaintiff's Proposed Standard

Plaintiff advances a stricter standard in his papers, contending that in addition to showing that the subject matter of the action relates to the agreement, defendants must further show that the parties to the action were also named parties to the arbitration agreement.  See AtGames Holdings, 394 F. Supp. 2d at 1255 ("The plain meaning of § 205 is clear that a state court action is removable if (1) the parties to the action have entered into an arbitration agreement, and (2) the action relates to that agreement.").  According to plaintiff, because none of the defendants is an actual signatory to the Warrant, the case must be remanded even if defendants are otherwise able to demonstrate their right to enforce the arbitration clause.

11

United States District Court
For the Northern District of California

In <u>AtGames Holdings</u>, the Central District of California considered whether the defendant, which was not a party to any arbitration agreement with plaintiff, could nonetheless assert federal jurisdiction based on plaintiff's ongoing participation in an arbitration with another company not involved in the lawsuit. <u>Id.</u> The court conceded that the outcome of the arbitration could affect the claims in the lawsuit, but refused to allow defendant to assert jurisdiction on that basis. Instead, the court found that defendant was required to show that an arbitration agreement existed between plaintiff and defendant. <u>Id.</u> In reaching its conclusion, the court was concerned with a problem altogether different from the one in this case: the collateral effects of an arbitration agreement in parallel proceedings involving different claims and parties. Here, in contrast, defendants argue that the arbitration agreement applies directly to claims in this lawsuit, albeit through an invocation of equitable estoppel. This court is unwilling to read the language in <u>AtGames Holdings</u> as expansively as plaintiff suggests.

This court's interpretation of <u>AtGames Holdings</u> is consistent with <u>GlobalSantaFe Drilling Co. v. Insurance Co. of Pennsylvania</u>, No. C 05-04411, 2006 WL 13090 (N.D. Cal. Jan. 3, 2006) (Wilken, J.), decided recently in this district. In <u>GlobalSantaFe Drilling</u>, plaintiff sued a number of insurers; certain insurers had included arbitration clauses in their policies with plaintiff. Those defendants (the "Removing Defendants") properly removed the action under section 205. Plaintiff then voluntarily dismissed its claims against the Removing Defendants, but not before the final remaining defendant ("Defendant") brought cross claims against the Removing Defendants. The court was thus required to consider whether the cross claims were sufficient to sustain jurisdiction under section 205.

Defendant argued that jurisdiction was improper under section 205 because Defendant was not a party to any arbitration agreement with the Removing Defendants. <u>Id.</u> at *4. The court cited <u>AtGames Holdings</u> with approval, but rephrased its holding, concluding that federal jurisdiction would continue to exist only if "Defendant . . . is required to arbitrate his cross-claims with Removing Defendants." <u>Id.</u> at *5. Rather than focusing on the formal requirement that Defendant and the Removing Defendants be "parties" to an arbitration agreement, the court reviewed whether

Defendant might be compelled to arbitrate under any theory, including the doctrine of equitable estoppel. Id. at *6. The court remanded the action after finding that arbitration could not be compelled under any legal or equitable theory. Id. at *8.

This court agrees with the reasoning in GlobalSantaFe Drilling and finds that the arbitration agreement relates to the claims in this lawsuit provided that there is a reasonable possibility that defendants will be able to assert the arbitration clause against plaintiff. The court will now consider whether defendants are likely to be able to do so.


3.    Relation to the Lawsuit

Under the preceding legal standard, defendants' argument that the arbitration clause in the Warrant is related to the instant lawsuit is flawed in several respects. First, plaintiff's claims do not depend in any way on the content of the Warrant for their success. Although the Warrant governs a single intermediate step of the allegedly fraudulent tax shelter transaction, plaintiff's claims of fraud are based solely on the communications between plaintiff and defendants, contained in the KPMG engagement and opinion letters. Plaintiff does not allege any breach of the terms of the Warrant. In sum, plaintiff's fraud claims are wholly independent of any wrongdoing associated with the Warrant. Second, defendants are not parties to the Warrant. Harbourtowne, the other signatory to the Warrant, is defunct and not a participant in this lawsuit. As discussed at oral argument, KPMG had no corporate relationship with or control over Harbourtowne at any time.

The Ninth Circuit has found fraud claims to be unrelated to an arbitration clause under similar circumstances in Britton v. Co-Op Banking Group, 4 F.3d 742 (9th Cir. 1993). In Britton, a company allegedly sold fraudulent tax shelters to a number of investors. Id. at 743. The contracts governing the sale of the tax shelters contained broad arbitration clauses, covering "[a]ny controversy or claim arising out of or relating to this Agreement or the breach thereof." Id. at 745. Subsequently, Jeff Liebling, an individual, purchased the company. Id. at 745. In an attempt to discourage or delay litigation relating to the fraudulent tax shelters, Liebling created several sham organizations purporting to represent the investors, through which he advised the investors not to

13

United States District Court

For the Northern District of California

1    pursue individual legal action.  Id. at 746–47.  The investors subsequently filed a class action against

2    Liebling, accusing him of attempting to defraud the investors into not pursuing their lawsuits.  Id.

3         Liebling attempted to assert the arbitration clause in the tax shelter contracts against the

4    plaintiffs.  Although Liebling was not a signatory to the contracts, he claimed that he was one of the

5    class of agents intended to benefit from the very broad language of the arbitration clause.  Id. at 746.

6    The Ninth Circuit disagreed, finding that the allegations of fraud against Liebling were independent

7    of the allegedly fraudulent tax shelters:  "[t]he only relevant acts charged against Liebling are set

8    forth in the complaint and none of them seek to impose liability from the contract."  Id. at 747.  The

9    court explained further:

10        The sum and substance of [the investors'] allegations are that [Liebling] in some way
          attempted to defraud the investors into not pursuing their law suits against the persons
11        who originally sold the securities under the contract.  These acts are subsequent,
          independent acts of fraud, unrelated to any provision or interpretation of the contract.
12
     Id. at 748.
13
14        The circumstances in this case are less compelling than those rejected in Britton.  The

15   language of the arbitration clause in this case is similarly broad, covering "[a]ny dispute, controversy

16   or claim arising out of or relating to this Agreement."  Warrant at 4.  As in Britton, defendants are

17   not parties to the Warrant.  Also, just as in Britton, the allegations against defendants in this case do

18   not "seek to impose liability from the [Warrant]" and are "independent acts of fraud, unrelated to

19   any provision or interpretation of the [Warant]."  The allegations depend solely on the actions of

20   KPMG and its partners.  Here, moreover, there is absolutely no relationship between defendants and

21   Harbourtowne.  In Britton, the Ninth Circuit found that the defendant lacked standing to assert the

22   arbitration clause despite being the successor in interest to the signatory.  Defendants' argument that

     the claims in this lawsuit relate to the Warrant is therefore meritless.
23
24        Defendants attempt to establish their right to enforce the arbitration clause by appealing to

25   the doctrine of equitable estoppel, which was not considered by the Ninth Circuit in Britton.  This

26   court recently considered the application of equitable estoppel to arbitration agreements in Fujian

     Pacific Electric Co. v. Bechtel Power Corp., No. C 04-3126, 2004 WL 2645974 (N.D. Cal. Nov. 19,
27
28                                                    14

2004) (Patel, J.).  In <u>Fujian Pacific Electric</u>, Fujian sued Bechtel and two of its subsidiaries for

breach of several contracts, including two construction contracts.  <u>Id.</u> at *1.  The construction

contracts, which contained arbitration clauses, were between Fujian and Bechtel's subsidiaries.

Bechtel was not a party to either contract.  Bechtel nonetheless sought to compel arbitration based

on principles of equitable estoppel.  <u>Id.</u> at *5.

> This court noted two distinct circumstances which may give rise to equitable estoppel.  First,
>
> equitable estoppel applies when the signatory to a written agreement containing an
> arbitration clause must rely on the terms of the written agreement in asserting its
> claims against the nonsignatory.  When each of a signatory's claims against a
> nonsignatory makes reference to or presumes the existence of the written agreement,
> the signatory's claims arise out of and relate directly to the written agreement, and
> arbitration is appropriate.

<u>Id.</u>  Second, "application of equitable estoppel is warranted when the signatory to the contract

containing an arbitration clause raises allegations of substantially interdependent and concerted

misconduct by both the nonsignatory and one or more of the signatories to the contract."  <u>Id.</u>

> With respect to the first form of equitable estoppel, this court explained that "[a] signatory to

an agreement cannot . . . 'have it both ways':  it cannot on the one hand, seek to hold the

non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration

provision, but on the other hand, deny the arbitration provision's applicability because the defendant

is a non-signatory."  <u>Id.</u> (citation omitted).  Because the basis for Fujian's lawsuit was breach of the

two agreements containing the arbitration clauses, this court found Fujian equitably estopped to deny

the applicability of the arbitration clause.  <u>Id.</u> at *6.

> With respect to the second form of equitable estoppel, this court noted that where the conduct

of a non-signatory is substantially interdependent with the conduct of a signatory, unless the non-

signatory is compelled to arbitrate, "arbitration proceedings between the two signatories would be

rendered meaningless and the federal policy in favor of arbitration effectively thwarted."  <u>Id.</u>  In

other words, where a lawsuit against non-signatories is inherently bound up with claims against a

signatory, the court should compel arbitration in order to avoid denying the signatory the benefit of

**United States District Court**
For the Northern District of California

15

1    the arbitration clause, and in order to avoid duplicative litigation which undermines the efficiency of

2    arbitration.

3           Defendants argue that both types of equitable estoppel are present in this case.  First,

4    defendants note that the complaint makes reference to the "complicated series of investments"

5    involved in the tax shelter, which includes plaintiff's investment in the Warrant.  Complaint ¶ 15.

6    Defendants argue that plaintiff could not have participated in the FLIP without executing the

7    Warrant, and that as a result the complaint presupposes the existence of the Warrant.

8           Second, defendants argue that their alleged misconduct is interdependent with the conduct of

9    Harbourtowne.  In support of this argument, defendants point to the same paragraph of the

10   complaint, which alleges that plaintiff entered into "a complicated series of investments, purchases

11   and sales, including transactions involving a Cayman Islands company"—i.e., Harbourtowne.

12   Complaint ¶ 15.  Further, defendants argue that Harbourtowne need not be a party to the lawsuit, or

13   even a party to a potential arbitration, in order for the second basis to apply.

14          With respect to defendants' first argument, unlike the claims in <u>Fujian</u> and the cases cited by

15   defendants, plaintiff's claims do not rely on the content of the Warrant for their success.  <u>Cf.</u> <u>Fujian</u>,

16   2004 WL 2645974, at *6.  As already discussed plaintiff's fraud claims depend only on the sale of

17   the tax shelter as a whole.  The complex innards of the shelter are for all relevant purposes a black

18   box.

19          With respect to their second argument, defendants do not offer a coherent explanation as to

20   how Harbourtowne was actively involved in the fraud alleged by plaintiff.  As the parties explained

21   at oral argument, the operative documents for plaintiff's fraud claims are the lengthy engagement

22   and opinion letters between KPMG and plaintiff which set forth the terms of plaintiff's investment

23   and KPMG's prediction of plaintiff's tax consequences.  The transaction with Harbourtowne was

24   one component of the FLIP tax shelter, but plaintiff's complaint does not allege or even presuppose

25   any wrongdoing by Harbourtowne.  Plaintiff's claims are perfectly consistent with the assumption

26   that Harbourtowne played no role in seeking to defraud plaintiff.

27

28

**United States District Court**
For the Northern District of California

16

In addition, none of the cases cited by defendants supports their argument that the "interdependent and concerted misconduct" justification applies where no claim can be asserted against the signatory and where arbitration against the signatory is not possible.  In Grigson v. Creative Artists Agency L.L.C., 210 F.3d 524, reh'g en banc denied, 218 F.3d 745 (5th Cir.), cert. denied, 531 U.S. 1013 (2000), a group of movie producers sought to recover damages for breach of the distribution agreement for the film *Return of the Texas Chainsaw Massacre*.  Id. at 525–26.  The producers first sued the studio, but dismissed the lawsuit when the studio sought to compel arbitration under a clause in the distribution agreement.  The producers then sued one of the actors in the movie and the actor's agent, alleging that they influenced the studio to breach the distribution agreement.  The Fifth Circuit held, first, that because the claims were based on a breach of the distribution agreement containing the arbitration clause, the producers were estopped from denying the applicability of the clause.  Id. at 527–28.  In addition, the court stated that "it would be especially inequitable where, as here, a signatory non-defendant is charged with interdependent and concerted misconduct with a non-signatory defendant. In such instances, that signatory, in essence, becomes a party, with resulting loss, *inter alia*, of time and money because of its required participation in the proceeding."  Id. at 528.  Here, in contrast, there is no possibility that Harbourtowne, a defunct Cayman Islands Corporation, will spend any time or money on this litigation.

In MS Dealer Service Corp. v. Franklin, 177 F.3d 942 (11th Cir. 1999), an arbitration between the plaintiff and the signatory defendant had already been completed.  Id. at 945 n.1, 946.  Plaintiff then pursued a federal lawsuit against the two remaining defendants, which were not signatories to the arbitration agreement.  The claims at issue alleged that all three defendants had conspired against plaintiff and were jointly liable for the resulting damages.  Id. at 945.  The court concluded that to allow the claims against the other two defendants to proceed in federal court would cause "the arbitration proceedings [between the two signatories] [to] be rendered meaningless."  Id. at 947.  Here, in contrast, there is no risk of conflicting with an arbitration between plaintiff and Harbourtowne, as Harbourtowne no longer exists.  Likewise, in Garcia v. Stonehenge, Ltd., No.

17

C-97-4368, 1998 WL 118177 (N.D. Cal. Mar. 2, 1998) (Walker, J.), the court permitted the application of equitable estoppel in order to avoid inefficient duplicate litigation. Id. at *5 ("Given the similarity between Stonehenge's claims against the estate and Stonehenge's claims against GDM and McQuaid, it would be unwise to resolve these claims in two different forums.").

Finally, in Hoffman v. Deloitte & Touche, LLP, 143 F. Supp. 2d 995 (N.D. Ill. 2001) plaintiffs sued a holding company and certain of its employees, as well as an accounting firm and an investment bank which had dealings with the holding company. The gravamen of plaintiffs' complaint was that the holding company had been created by defendants as part of a scheme to defraud investors. Id. at 997. Plaintiffs had purchased stock in the company; the stock purchase agreements included broad arbitration clauses. Id. at 1003. The court found that the non-signatory defendants could assert the arbitration clause under a number of theories, including equitable estoppel. According to the court, "all the defendants conspired to induce them to participate in the roll-up. Indeed, both complaints contain civil conspiracy counts. The claims thus raise allegations of substantially interdependent and concerted misconduct by both the signatory (EPS) and the non-signatories." Id. at 1005. Hoffman, like the other cases cited by defendants, simply stands for the proposition that where certain parties are clearly compelled to arbitrate, other closely related claims should be included in the scope of the arbitration. Here, in contrast, no claims against Harbourtowne are contemplated, or even possible.

In sum, defendants make no plausible argument as to why they should be entitled to assert the arbitration clause.

4.      Unclean Hands

Even if defendants were able to make a *prima facie* showing that equitable estoppel might apply, the doctrine of unclean hands would preclude the court from applying equitable estoppel in this case. "The unclean hands doctrine closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 841 (9th Cir.), cert. denied, 537 U.S. 1047 (2002).

18

United States District Court

For the Northern District of California

The relief sought by defendants in this case is enforcement of the terms of the Warrant against plaintiff.  Defendants' invocation of the Warrant is tainted by bad faith in a number of ways.  First, defendant KPMG has stipulated on the public record that the Warrant agreement was fraudulent.  Second, as the parties discussed at oral argument, Harbourtowne itself was created for the sole purpose of facilitating the tax shelter at issue in this case—a tax shelter which KPMG has acknowledged to be in violation of federal tax laws.  Third, defendants had ample opportunity to choose arbitration in their own engagement letters with plaintiff but failed to do so.  What defendants ask this court to do—enforce an arbitration clause in a fraudulent contract, not signed by defendants, involving a phantom, now-defunct company, and bearing only an incidental relationship to the dispute at the heart of this lawsuit—would make a mockery of this court's equitable powers.

Defendants argue in the alternative that the arbitrator, and not this court, should evaluate plaintiff's unclean hands defense.  The two cases cited by defendants are inapplicable, as neither considers the use of unclean hands to defeat a claim of equitable estoppel which itself is a predicate to arbitration.  Cf. Teamsters Freight Checkers, Clerical Employees and Helpers Local Union No. 865 v. Nabisco Brands, Inc., 852 F. Supp 872, 874–75 (N.D. Cal. 1994) (Wilken, J.); Parker v. Paine Webber Jackson & Curtis, Inc., No. 81 C 1494, 1982 U.S. Dist. LEXIS 13482, at *6–*7 (N.D. Ill. May 24, 1982).

In sum, none of the cases cited by defendants contains the particular set of factors present here, and nothing justifies the equitable relief which defendants seek.  Defendants do not have the right to assert the arbitration clause in the Warrant.  Plaintiff's motion to remand is therefore granted.

II.    Fees and Costs

Upon granting a motion to remand, the court may "require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."  28 U.S.C. § 1447(c).  Although the court finds defendants' arguments to lack merit, other courts have upheld federal jurisdiction under similar circumstances—albeit after only a cursory analysis of the parties'

19

arguments.  <u>See, e.g.</u>, <u>Reddam</u>, No. CV 04-1227 GLT, slip op. at 3 (C.D. Cal. Dec. 15, 2004).  In light of these previous decisions, an award of fees and costs is not appropriate.

<u>CONCLUSION</u>

For the above reasons the court hereby GRANTS plaintiff's motion to remand and DENIES defendants' motion to compel arbitration.  The court DENIES plaintiff's motion for fees and costs. A certified copy of this order shall be sent to the Superior Court for the County of San Mateo, and the clerk shall close the file.

IT IS SO ORDERED.

Date: March 16, 2006

MARILYN HALL PATEL
United States District Judge
Northern District of California

**United States District Court**
For the Northern District of California

20

ENDNOTES

1.  Unless otherwise noted, background facts are taken from the complaint and notice of removal.

2.  The court notes, however, that the two copies of the Warrant submitted by defendants are deficient or suspicious in a number of respects.  First, as plaintiff correctly observes, the documents are not accompanied by competent testimony establishing their chain of custody.  Second, the documents themselves appear to be cobbled together, either from a number of faxes from different entities, spanning a multi-year period, or from multiple versions of the Warrant purportedly signed by plaintiff on different dates.  Compare Supplemental Thomases Dec., Exh. C at 4 with id. at 5, 6–7; see also Thomases Dec., Exh. A at 2–3.

21